**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

| | |
|---|---|
| **DOUGLAS M. LARSON, individually and on behalf of all others similarly situated,**<br><br>Plaintiff,<br><br>v.<br><br>**BECKETT COLLECTIBLES, LLC and BECKETT AUTHENTICATION SERVICES, LLC,**<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Negligence<br>2. Breach of Implied Contract<br>3. Violation of the New Mexico Unfair Practices Act<br>4. Restitution / Unjust Enrichment<br>5. Declaratory and Injunctive Relief<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Douglas M. Larson ("Plaintiff" or "Larson"), individually and on behalf of all others similarly situated, alleges the following against Defendants Beckett Collectibles, LLC and Beckett Authentication Services, LLC (collectively, "Beckett" or "Defendants") upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, after a reasonable investigation that is continuing:

## NATURE OF THE ACTION

1. This putative class action arises from Defendants' failure to use reasonable safeguards to protect customer information that they collected and retained in connection with collectibles, grading, authentication, marketplace, subscription, and related services, and from their failure to provide affected persons with a prompt and complete accounting after that information was stolen, offered for sale, and publicly disseminated in a November 2025 data breach (the "Data Breach").

2. Have I Been Pwned ("HIBP") reports that Beckett experienced a data breach in November 2025 accompanied by defacement of website content. The stolen data was advertised

for sale on a prominent hacking forum, portions were released publicly, and a later corpus contained more than one million email addresses.[1]

3. The publicly reported compromised fields include email addresses, names, usernames, telephone numbers, and physical addresses. Those fields can be combined to identify, contact, profile, impersonate, and socially engineer victims, and the association with Beckett can identify a person as a collector, customer, consignor, seller, dealer, subscriber, or owner of collectible property.

4. Plaintiff and counsel verified through HIBP's breach-specific lookup that the same personal Gmail address Plaintiff provided directly to Beckett appears in the Beckett breach corpus. This is not a case in which Plaintiff merely received generalized news of an incident or speculates that his information might have been involved.

5. Plaintiff's contemporaneous records independently show that Beckett collected and electronically retained his name, Gmail address, personal telephone number, physical address, submission number, service details, and transaction-linked information. Beckett continued to use those identifiers in its online customer-support systems after the original transaction.

6. On August 29, 2021, Plaintiff purchased a $150 autograph-authentication service from Beckett Authentication Services at the Colorado Springs Comic Con. He paid in person with a payment card and received a Beckett submission form and transaction receipt associated with Submission No. 100235.

7. The form directed Plaintiff to provide his name, address, telephone number, and email address in a section labeled "Important for customer notification." Beckett thereby

[1] See Have I Been Pwned, Beckett Collectibles Data Breach, https://haveibeenpwned.com/Breach/Beckett (last visited July 27, 2026).

represented, expressly and by implication, that it was collecting those identifiers for legitimate customer-service and notification purposes and would exercise reasonable care in retaining and using them.

8. In December 2021 and during January and February 2022, Plaintiff used Beckett's web and email support channels to seek the final authentication results and a refund. Beckett's support records reproduced his exact name, Gmail address, telephone number, submission number, transaction date, event location, service description, and attached invoice.

9. The match among Plaintiff's preserved records, Beckett's own support communications, and HIBP's breach-specific verification supplies a direct, plaintiff-specific chain connecting the Data Breach to Plaintiff's information.

10. Actual theft, attempted sale, and public release caused a completed loss of privacy and confidentiality. Plaintiff's identifying information cannot be recalled from the persons and systems that obtained it, and the information remains useful for phishing, impersonation, account-recovery abuse, and other forms of fraud.

11. After the Data Breach and public dissemination, Plaintiff experienced a significant and sustained increase in spam and phishing attempts directed to his compromised contact channels. He has spent and continues to spend time reviewing suspicious communications, securing accounts, monitoring for misuse, and protecting his personal and business systems.

12. In April 2026, Plaintiff's website, freedrama.com, also sustained a concentrated fraudulent-transaction attack through its Stripe payment function. One customer's card was charged and Plaintiff reimbursed that customer; numerous other transactions were denied; Plaintiff's store could not process legitimate transactions during the incident; and Plaintiff removed Stripe and migrated to PayPal, which has reduced business.

13. Plaintiff used the same compromised Gmail address to administer the Stripe relationship. Plaintiff alleges that the timing, targeting, and identity linkage are consistent with misuse or weaponization of exposed identifying information, and the technical route of the attack is within the records of Defendants, Stripe, hosting providers, and the threat actors.

14. The Stripe incident is not Plaintiff's sole injury. His actual publication injury, loss of confidentiality, increased phishing and spam, reasonable mitigation time, and ongoing account-protection burdens are independently concrete and traceable to the Data Breach. The Stripe incident supplies additional consequential loss and a subject for merits discovery.

15. Plaintiff brings this action to obtain compensatory, consequential, nominal, restitutionary, statutory, and other available relief; to require a complete accounting of the information and systems involved; to obtain appropriate prospective security and data-minimization relief; and to protect the Class from continuing misuse of information that Defendants collected for profit but failed to safeguard.

## PARTIES

16. Plaintiff Douglas M. Larson is a natural person and citizen of New Mexico domiciled in Rio Rancho, Sandoval County, New Mexico. He experienced the privacy invasion, phishing, mitigation burdens, business interruption, and economic effects alleged in this Complaint in New Mexico.

17. Plaintiff owns and operates freedrama.com as a sole proprietorship. The payment-processor account, customer refund, store interruption, migration burdens, and reduced business described above therefore injured Plaintiff personally rather than a separate corporation or limited liability company.

18. Defendant Beckett Collectibles, LLC is, on information and belief, a North Carolina limited liability company headquartered in Texas. Beckett publicly lists its mailing address as 2700 Summit Avenue, Suite 100, Plano, Texas 75074.

19. Beckett Collectibles owns, operates, controls, and/or is responsible for Beckett.com, member and customer accounts, customer databases, marketplace and subscription functions, privacy and security practices, and the systems identified publicly in connection with the Data Breach.

20. Defendant Beckett Authentication Services, LLC is, on information and belief, a North Carolina limited liability company that operates or is responsible for Beckett's autograph-authentication business and related customer, submission, transaction, and support records.

21. Beckett Authentication Services directly transacted with Plaintiff, accepted his $150 payment, assigned Submission No. 100235, collected his identifying information, and later communicated with him through authentication@beckett.com and Beckett-linked support systems.

22. Defendants operated as an integrated enterprise for the conduct at issue. Plaintiff's paper form displayed Beckett Authentication Services and beckett-authentication.com; the later online support workflow used Beckett domains and Beckett-branded systems; and HIBP identifies the compromised service as Beckett Collectibles.

23. The precise allocation of database ownership, hosting, security, retention, incident-response, payment-processing, and notification responsibilities between the two Defendants and their vendors is peculiarly within Defendants' possession. Plaintiff therefore pleads their responsibility in the alternative and reserves the right to conform the parties and allegations to discovery.

24. At all relevant times, each Defendant acted through its officers, employees, agents, contractors, affiliates, vendors, and service providers within the course and scope of those relationships. To the extent one Defendant collected or stored information for the other, that conduct was authorized, directed, ratified, and undertaken for their shared commercial benefit.

25. Plaintiff is presently unaware of the names and legal identities of all hosting providers, security vendors, support vendors, payment processors, affiliated data controllers, and other persons responsible for the affected systems. Plaintiff will seek leave to add or substitute parties if discovery establishes that additional entities are legally responsible.

## JURISDICTION AND VENUE

26. This Court has original subject-matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).

27. The proposed Classes contain far more than 100 members. HIBP reports approximately one million affected accounts, including an initial public corpus of more than 500,000 email addresses reportedly belonging to North American customers.

28. The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Class members seek damages for actual dissemination, lost privacy and confidentiality, mitigation time, documented misuse and fraud, business interruption and consequential loss where applicable, restitution, statutory relief, and the cost and value of requested equitable relief. The claims are aggregated under 28 U.S.C. § 1332(d)(6).

29. Minimal diversity exists. Plaintiff is a citizen of New Mexico, while Defendants are citizens of one or more states other than New Mexico, including North Carolina and Texas. For CAFA purposes, an unincorporated association is deemed a citizen of the state under whose

laws it is organized and the state where it has its principal place of business. 28 U.S.C. § 1332(d)(10).

30. No mandatory CAFA exception applies. The Data Breach affected a geographically dispersed population, Defendants are not citizens of New Mexico, and the principal security and incident-response conduct was not confined to New Mexico.

31. This Court may grant declaratory and further relief under 28 U.S.C. §§ 2201 and 2202 and has authority to award all legal and equitable remedies requested below.

32. This Court has personal jurisdiction over Defendants because they purposefully market and provide their services to residents of New Mexico through nationwide websites, online systems, event-based services, submission and shipping channels, marketplace functions, and customer-support operations, and because they collect, retain, process, use, and derive commercial benefit from information belonging to New Mexico residents.

33. Defendants maintained and processed Plaintiff's information while he was domiciled in New Mexico and allegedly failed to protect, minimize, delete, accurately account for, and provide complete notice concerning that information. Those omissions foreseeably caused effects in New Mexico, including actual privacy loss, phishing, mitigation, and economic harm to a New Mexico citizen.

34. Defendants' conduct created a continuing relationship with affected consumers after any initial sale because Defendants retained their names, addresses, telephone numbers, emails, usernames, customer histories, submission records, and associated data for customer service, authentication, marketing, account administration, valuation, verification, and other ongoing business purposes.

35. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District: Defendants continued to retain and process Plaintiff's information while he resided here; Plaintiff's information was lost and made available for misuse here; Defendants failed to provide Plaintiff in this District a complete accounting and adequate protective response; and Plaintiff suffered the privacy, mitigation, phishing, business, and economic injuries alleged here.

36. Venue in Plaintiff's home forum is also convenient and fair. Plaintiff and his relevant personal and sole-proprietor records are located in New Mexico; the relevant corporate and technical discovery is predominantly electronic; and transfer would merely shift inconvenience from Defendants to the individual victim whose information they collected and retained.

37. Plaintiff does not concede that any forum-selection provision applies. The face of Plaintiff's August 2021 in-person form does not identify a forum or arbitration requirement, the presently available copy does not reveal the purported reverse-side terms, and Defendants' currently posted Member Terms postdate Plaintiff's transaction and the creation of his records by approximately four years.

38. To the extent the law of another state governs any claim or subset of claims, Plaintiff pleads the substantively similar law of that state in the alternative and reserves the right to propose appropriate state-law subclasses after discovery. The existence of choice-of-law questions does not defeat subject-matter jurisdiction or Plaintiff's individual claims.

## FACTUAL ALLEGATIONS

### *A. Defendants' Services and Collection of Customer Information*

39. Beckett is a prominent provider of collectibles-related products and services, including grading, authentication, pricing, marketplace, subscription, publication, and customer-account services. Its business depends on customers entrusting it with identifying, contact, account, submission, shipping, transaction, and collection-related information.

40. Defendants collect information through multiple channels, including websites, account-registration systems, mobile and desktop interfaces, paper forms, conventions and trade shows, mailed submissions, payment transactions, marketplace activities, customer-service tickets, email communications, vendors, and support platforms.

41. The information Defendants collect can include names, email addresses, usernames, telephone numbers, physical addresses, customer numbers, submission numbers, order histories, authentication or grading details, shipping information, payment status, and transaction metadata.

42. The publicly reported compromised fields are themselves valuable. An accurate name, email address, telephone number, username, and physical address allow a threat actor to link an identity across systems, generate convincing phishing communications, attempt account recovery, locate public-facing business assets, and target the victim based on the victim's association with a particular service.

43. The Beckett association increases the utility of the data because it permits threat actors to tailor communications to collectibles, grading, authentication, marketplace, shipping, invoices, account verification, payment, or customer-support themes and to identify persons who may own transportable items of value.

44. Customers cannot reasonably inspect Defendants' source code, network architecture, identity-and-access controls, logs, vendor permissions, backup environments, patching status, encryption practices, incident-response preparation, or data-retention rules. Defendants possess superior knowledge and exclusive control over those matters.

45. By collecting and retaining customer information, Defendants assumed a duty to use reasonable administrative, technical, and physical safeguards proportionate to the nature, volume, and foreseeable misuse of the information.

46. Reasonable safeguards include, as appropriate, access controls, least-privilege administration, multifactor authentication for privileged access, segmentation, secure software development, vulnerability and patch management, endpoint and network monitoring, encryption and sound key management, logging, anomaly and exfiltration detection, vendor controls, tested incident-response procedures, backup protection, and data minimization.

47. Reasonable security also requires retaining customer information only for legitimate business and legal needs, deleting or de-identifying stale data, limiting the systems and personnel that can access it, and maintaining reliable data inventories so that a breach can be accurately investigated and disclosed.

48. Defendants' current public Privacy Policy states that they strive to use "commercially acceptable means" to protect personal data.[2] Plaintiff will seek historical privacy notices and internal policies applicable to the periods when his information was collected and retained.

49. No reasonable consumer would knowingly provide identifying and transaction-linked information to a collectibles business that intended to store the information without

[2] See *Beckett, Privacy Policy,* https://www.beckett.com/privacy (last visited July 27, 2026).

reasonable security, keep it beyond legitimate need without adequate controls, or remain unable to provide an accurate account after criminals offered the information for sale and released it publicly.

50. The New Mexico Legislature has independently recognized that persons who own or license personal identifying information about New Mexico residents should implement and maintain reasonable security procedures and practices appropriate to the nature of the information.[3] Plaintiff does not assert an independent private damages count under that provision; he cites it as evidence of public policy and the standard of reasonable care.

51. The Federal Trade Commission has likewise long advised businesses to know what information they possess, keep only what they need, protect what they keep, properly dispose of what they no longer need, and plan for security incidents. These principles were well established before the Data Breach.

52. The threat of criminal attacks against companies holding customer identity, contact, account, and transaction-linked information was foreseeable. The attempted sale and public release of the data were not extraordinary consequences outside the risk that reasonable cybersecurity was designed to prevent; they were the very risks requiring safeguards.

***B. Plaintiff's In-Person Transaction and Beckett's Retention of His Records***

53. On August 29, 2021, Plaintiff attended the Colorado Springs Comic Con and purchased Beckett Authentication Services' full autograph-authentication service for a Pink Floyd autographed guitar.

54. Beckett assigned Plaintiff Submission No. 100235 and charged $150. Plaintiff paid the charge in person using a payment card. His customer copy of the Beckett form contains the $150 charge, his signature and date, and a transaction receipt affixed to the form.

[3] See N.M. Stat. Ann. § 57-12C-4.

55. The form required Plaintiff to provide his name, telephone number, physical address, city, state, ZIP code, and email address. Those fields appeared immediately under the printed description "Important for customer notification."

56. Plaintiff provided his personal Gmail address and personal telephone number beginning with the New Mexico 505 area code. He also provided the physical address where he then resided in Colorado Springs, Colorado.

57. Plaintiff reasonably understood that Beckett needed the information to identify and administer Submission No. 100235, communicate the authentication result, return or ship the item as necessary, respond to questions, and document the paid service. He did not authorize Beckett to expose the information to criminals or the public.

58. The face of the form states that by signing, the customer acknowledges terms and conditions "stated on the reverse." The presently available scanned customer copy contains only the front page and does not reveal the language, placement, or legibility of any reverse-side terms.

59. No arbitration provision, class waiver, jury waiver, online Member Terms, or forum-selection clause appears on the face of Plaintiff's preserved form. Plaintiff did not receive or knowingly assent to the online Member Terms that Beckett later posted with an effective date of August 7, 2025.

60. Beckett did not deliver the promised final letter or final authentication result. Plaintiff therefore contacted Beckett repeatedly seeking the result and a refund of his $150 payment.

61. On December 29, 2021, Plaintiff submitted a request through beckett-authentication.com. Beckett's resulting support record reproduced Plaintiff's full name, exact

Gmail address, exact telephone number, and narrative identifying the August 2021 Comic Con submission and Pink Floyd autographed guitar.

62. The support record also retained or linked Plaintiff's invoice. Beckett and its support vendor treated the request as a Beckett Authentication Services matter and communicated through an @beckett.com address.

63. During January and February 2022, Plaintiff continued to communicate with Beckett under support Ticket Nos. 38566 and 43743. Those communications repeatedly referenced Submission No. 100235, the August 29, 2021 transaction, the $150 payment, the Comic Con location, and the authentication service.

64. These records establish that Plaintiff's identifiers were not merely written on a paper form and immediately discarded. Defendants digitized, reproduced, linked, and used the information in electronic support and customer systems.

65. The later HIBP verification that Plaintiff's exact Gmail address appears in the Beckett corpus supports the reasonable inference that Defendants retained Plaintiff's information until the Data Breach or transferred it into a system later compromised.

66. Defendants' own records will identify the complete fields associated with Plaintiff's compromised row or rows, the database tables and systems involved, whether his telephone number and physical address were included, and whether submission, transaction, or payment-linked metadata accompanied the publicly reported fields.

67. Public reporting does not presently identify full payment-card numbers among the published Beckett fields, and Plaintiff does not allege without discovery that his full card number or security code was publicly released. The exact involvement of card brand, last four digits,

tokenized payment data, payment receipt information, transaction amount, transaction date, or other payment-linked metadata remains within Defendants' exclusive knowledge.

68. Defendants had no legitimate reason to preserve stale identifying and transaction-linked information indefinitely in broadly accessible systems without controls proportionate to the foreseeable risk. If they retained Plaintiff's information for customer service, record verification, marketing, analytics, compliance, or commercial value, they were required to protect it for as long as they retained it.

69. Plaintiff supplied information and payment as part of a direct consumer transaction with Beckett. This direct exchange distinguishes him from a person whose information reached a software vendor only indirectly through another business.

***C. The November 2025 Data Breach, Attempted Sale, and Public Release***

70. In November 2025, an unauthorized actor compromised Beckett and defaced website content. The defacement supplied an immediate visible indication that an attacker had obtained the ability to alter or control at least part of Beckett's environment.

71. The stolen Beckett data was subsequently advertised for sale on a prominent hacking forum. Offering customer information for sale demonstrates intentional acquisition for misuse or monetization rather than an accidental internal disclosure.

72. Portions of the data were then released publicly. The publicly circulating data initially included more than 500,000 email addresses reportedly belonging to North American customers.

73. The following month, a larger Beckett corpus containing more than one million email addresses was published. HIBP identifies approximately one million affected accounts and lists the breach as occurring in November 2025.

74. The compromised categories reported by HIBP include email addresses, names, usernames, telephone numbers, and physical addresses. The combination supplies multiple independent channels for contacting and profiling victims and for making fraudulent messages appear credible.

75. Actual public dissemination is materially different from a mere allegation that information might have been viewed. Once information is copied, offered for sale, and released, victims lose the confidentiality and control for which they entrusted it to the data holder.

76. Threat actors can copy and redistribute the information indefinitely, combine it with information from public sources or other breaches, and use it at times of their choosing. A later criminal act need not occur immediately after publication to be a foreseeable consequence of the original exposure.

77. Defendants have not provided Plaintiff with a complete individualized accounting identifying the compromised systems, the dates of unauthorized access and exfiltration, the data fields associated with his record, the security control that failed, the period for which the information had been retained, or the entities that received or downloaded the corpus.

78. Defendants also have not established to Plaintiff that all compromised access paths, credentials, vulnerabilities, data stores, backups, vendors, and retention practices have been identified and remediated or that stale information associated with Plaintiff has been deleted from unaffected systems.

79. The exact method of compromise, duration of unauthorized access, affected databases, number of unique U.S. victims, number of New Mexico victims, contents of individual records, and Defendants' knowledge and response timeline are matters for discovery.

80. On information and belief, the Data Breach was caused or materially enabled by one or more failures in access control, authentication, segmentation, vulnerability management, monitoring, exfiltration detection, credential protection, data minimization, vendor management, logging, incident response, or related security practices.

81. On information and belief, reasonable security measures would have prevented the unauthorized access, materially reduced the volume of information available to the attacker, detected the intrusion and exfiltration sooner, limited lateral movement, preserved better evidence, or allowed Defendants to warn victims more promptly and accurately.

***D. Verification of Plaintiff's Compromised Information and Resulting Harm***

82. Plaintiff and counsel used HIBP's breach-specific verification process and confirmed that Plaintiff's personal Gmail address appears in the Beckett corpus. Plaintiff has preserved evidence of that verification and will produce it through appropriate discovery procedures.

83. The verified Gmail address is the same address handwritten on Plaintiff's August 2021 Beckett form and reproduced in Beckett's December 2021 and 2022 support records. The precise identifier match makes it plausible that the public corpus contains the record created from Plaintiff's Beckett transaction and subsequent support interactions.

84. Plaintiff's name and telephone number also appear in Beckett's own records and are among the categories HIBP reports as compromised. Whether Plaintiff's specific corpus row includes those fields and which physical address is associated with it will be confirmed through Defendants' data and the underlying corpus.

85. Plaintiff has suffered a completed privacy injury because his Beckett-linked Gmail address was taken from Defendants, offered for sale as part of the Beckett dataset, and published to persons who had no authorization to possess or use it.

86. Following the Data Breach and public release, Plaintiff experienced a significant increase in unsolicited spam and phishing communications. The communications impose recurring burdens because Plaintiff must distinguish legitimate customer, payment, security, and business messages from attempts to induce clicks, credential disclosure, payment, or other action.

87. The increased communications are consistent with the foreseeable use of exposed names, email addresses, telephone numbers, physical addresses, usernames, and service associations for social engineering. Criminals do not need a Social Security number or full card number to send convincing account, shipping, invoice, support, marketplace, or payment-themed phishing messages.

88. Plaintiff has spent substantial time investigating the breach, reviewing HIBP information, preserving records, evaluating suspicious communications, strengthening account security, monitoring personal and business accounts, addressing the Stripe incident, changing payment-processing arrangements, and communicating with counsel.

89. Plaintiff's time has value. Time diverted to breach response and account protection is time he cannot use for his sole proprietorship, creative work, customers, family, or other productive activity.

90. Plaintiff must remain vigilant because the publicly released information is durable, easily copied, and can be combined with other lawful or unlawful sources. The cost of that vigilance was shifted to Plaintiff by Defendants' alleged failure to protect information they chose to retain.

91. In April 2026, freedrama.com's Stripe checkout function was overwhelmed by fraudulent transactions. At least one real customer's card was charged, and Plaintiff refunded that customer. Stripe denied the other attempted transactions, but Plaintiff's store was unable to accept legitimate transactions during the attack.

92. Plaintiff removed Stripe from the website and migrated to PayPal to reduce the risk and restore payment capability. The change required time and effort and has reduced business because not every prospective customer can or will complete payment through PayPal.

93. Knowing a merchant's accurate identity and contact information can assist threat actors in locating the merchant's online business, impersonating the merchant or service providers, conducting account-recovery attacks, or tailoring an attack to the merchant's payment environment. At the same time, automated card testing can also target a publicly discoverable checkout endpoint. Discovery is needed to determine the precise causal pathway here.

94. Plaintiff alleges the Stripe incident as consequential misuse or targeting plausibly connected to the exposed identity and contact information, not as a conclusory assertion that possession of his Gmail address alone supplied technical access to Stripe.

95. Regardless of the ultimate attribution of every attempted Stripe transaction, the customer refund, temporary loss of payment functionality, remediation work, processor migration, and reduced sales are real, documented consequences that form part of Plaintiff's damages evidence and merits investigation.

96. Because freedrama.com is a sole proprietorship, Plaintiff personally bore the refund, lost use, migration burden, and reduced revenue. No separate entity stands between Plaintiff and those losses.

97. Plaintiff's injuries are not limited to generalized anxiety or a speculative future risk. They include actual public disclosure, loss of privacy and confidentiality, unwanted communications, reasonable mitigation time, account-protection burdens, and out-of-pocket and business consequences.

98. The criminal acts of the attacker do not sever causation as a matter of pleading. Theft, sale, publication, phishing, fraud, and related misuse are the foreseeable harms that reasonable security and prompt incident response are intended to prevent or mitigate.

99. Plaintiff continues to face a substantial and concrete risk of additional misuse because the information has been publicly released and cannot be changed as easily as a password or replacement card, particularly his name, telephone number, historical addresses, service association, and long-used Gmail address.

***E. Defendants' Alleged Security, Retention, and Incident-Response Failures***

100. Defendants had a duty to use ordinary and reasonable care in collecting, storing, retaining, transmitting, accessing, securing, and disposing of customer information and in preparing for, detecting, containing, investigating, and disclosing a security incident.

101. Defendants breached those duties by failing to implement, maintain, test, and enforce safeguards proportionate to the foreseeable risk, including one or more deficiencies in authentication, privileged access, least privilege, segmentation, vulnerability management, patching, monitoring, endpoint protection, logging, exfiltration detection, encryption, credential management, vendor controls, backups, incident response, and data minimization.

102. On information and belief, Defendants retained Plaintiff's contact and transaction-linked information longer, more broadly, or in more systems than reasonably necessary without implementing protections proportionate to that retention.

103. On information and belief, Defendants failed to maintain a complete and reliable inventory of affected data or failed to use that inventory to give Plaintiff a prompt, individualized, and accurate account of the fields and systems involving his information.

104. On information and belief, Defendants failed to timely detect or contain the unauthorized access before the attacker could exfiltrate enough information to advertise it for sale and release multiple large corpora publicly.

105. On information and belief, Defendants failed to maintain adequate controls over websites, applications, administrative functions, credentials, code, third-party components, or vendors, as demonstrated by the accompanying website defacement and data theft.

106. On information and belief, Defendants failed to preserve or promptly analyze sufficient logs and forensic evidence to identify all affected records and provide a reliable individualized account, or they possess that information and have failed to provide it to Plaintiff.

107. On information and belief, Defendants failed to provide sufficiently prompt and complete notice to permit Plaintiff to harden the specific email, telephone, address, payment, submission, and business relationships associated with the exposed record before later phishing and misuse occurred.

108. Defendants' failure to provide Plaintiff a complete accounting independently magnified the harm. A victim cannot make proportionate protection decisions without knowing which identifiers, transaction fields, addresses, and systems were involved and whether the information was merely accessed, exfiltrated, sold, or publicly released.

109. If Defendants contend the Data Breach resulted from a vendor, criminal exploit, or unforeseeable third-party act, those contentions raise factual questions concerning vendor selection and oversight, security architecture, known vulnerabilities, warnings, patch availability, access

controls, contractual allocation, and incident response. They do not negate the duty arising from Defendants' affirmative collection and retention of the information.

110. Defendants benefited from retaining customer data for operational, customer-service, authentication, verification, marketing, analytic, and commercial purposes, while customers bore the privacy and misuse risk. Reasonable security and minimization were part of the cost of obtaining those benefits, not optional services for which customers had to bargain separately.

111. The facts concerning the precise vulnerability, responsible system, attacker access, control failures, internal warnings, remediation timeline, and security budget are not available to Plaintiff before discovery. Rule 8 does not require a consumer to plead the source code, network logs, or forensic findings controlled by the data custodian.

112. The occurrence of a breach alone does not automatically prove negligence. Here, however, the pleaded facts go further: website defacement, theft of a large customer dataset, attempted sale, staged public releases exceeding one million accounts, direct verification of Plaintiff's record, and the absence of a complete individualized accounting plausibly support deficiencies requiring discovery.

113. Defendants' conduct caused or substantially contributed to the unauthorized access, acquisition, sale, dissemination, and continuing misuse of Plaintiff's and Class members' information and deprived them of the opportunity to mitigate sooner and more precisely.

***F. Contract Formation and the Later-Posted Arbitration Terms***

114. Plaintiff's paid transaction occurred in person on August 29, 2021. He completed and signed a paper Beckett Authentication Services form, paid $150, and supplied the information Beckett required to perform and administer the service.

115. The face of the 2021 form does not contain an arbitration clause, class waiver, jury waiver, delegation clause, or reference to Beckett's later online Member Terms. It refers generally to terms and conditions stated on the reverse, but the copy available to Plaintiff and counsel does not reveal that text.

116. Beckett's currently posted Member Terms state an effective date of August 7, 2025 and contain mandatory arbitration and class-action-waiver language.[4]

117. Plaintiff's transaction, the creation of his submission record, the collection of his identifying information, and his customer-support interactions predate those later-posted Member Terms by years.

118. Plaintiff did not knowingly or affirmatively agree that the August 7, 2025 Member Terms would retroactively govern information collected through his 2021 in-person transaction or tort and statutory claims arising from Defendants' later data-security and incident-response conduct.

119. If Defendants invoke any reverse-side term from the 2021 form, they must identify and authenticate the exact contemporaneous form, language, font, placement, and version presented to Plaintiff and establish reasonable notice, assent, consideration, scope, and enforceability.

120. If Defendants invoke later online terms, they must establish the specific interface, notice, affirmative act, timestamp, account, and version through which Plaintiff allegedly assented. A general assertion that terms existed on a website is not evidence that this in-person customer agreed to them.

---

[4] See *Beckett, Member Terms of Service Agreement*, https://www.beckett.com/tos (last visited July 27, 2026).

121. Plaintiff challenges contract formation and assent to any purported arbitration agreement or class waiver not contained in the face of the signed 2021 document. Questions of whether an agreement was formed are for the Court, notwithstanding any purported delegation language in an unformed or unproven agreement.

122. Plaintiff further disputes that any contractual clause directed to disputes over authentication services necessarily reaches later tort and statutory claims arising from the negligent retention, security, theft, sale, and public release of information, particularly where the challenged duties exist independently of contract.

123. Plaintiff does not waive any additional defense to arbitration, delegation, waiver, limitation, or forum selection, including lack of notice, lack of mutual assent, retroactivity, illusoriness, unconscionability, scope, supersession, or failure to satisfy conditions precedent.

## CLASS ACTION ALLEGATIONS

124. Plaintiff brings this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and, where appropriate, 23(c)(4), on behalf of himself and the following proposed classes, subject to modification after discovery:

> **Nationwide Class:** All persons in the United States whose personal information was accessed, acquired, exfiltrated, offered for sale, or publicly disseminated in the November 2025 Beckett Data Breach.
>
> **New Mexico Subclass:** All citizens of New Mexico who are members of the Nationwide Class.
>
> **Paid-Customer Subclass:** All members of the Nationwide Class who directly paid one or more Defendants for a grading, authentication, subscription, marketplace, publication, or related service and supplied personal information in connection with that transaction.

125. Excluded from the proposed Classes are Defendants; their parents, subsidiaries, affiliates, officers, directors, and legal representatives; the judicial officers assigned to this action

and their immediate families and staff; and any person who timely and validly requests exclusion from a certified damages class.

126. Plaintiff reserves the right to amend the class definitions, add state-law subclasses, add a documented-misuse subclass, add a payment-linked-data subclass if supported by discovery, or seek certification of particular issues under Rule 23(c)(4).

127. Numerosity. The proposed Nationwide Class is so numerous that joinder is impracticable. HIBP reports approximately one million affected accounts. The identities and contact information of Class members are ascertainable from Defendants' databases, forensic results, notification lists, and the corpus itself.

128. The New Mexico Subclass and Paid-Customer Subclass are likewise sufficiently numerous on information and belief. The exact numbers are in Defendants' records and will be established through discovery.

129. Commonality. Common questions of law and fact include:

a. which Defendants owned, controlled, hosted, secured, retained, or used the affected systems and data;

b. when and how the attacker obtained access, what systems and vulnerabilities were involved, and how long the access persisted;

c. whether Defendants used security practices reasonable for the nature and volume of the information;

d. whether Defendants minimized, segregated, encrypted, monitored, and timely deleted customer information;

e. whether Defendants adequately managed vendors, credentials, administrative privileges, logs, and incident response;

f. what categories of information were accessed, exfiltrated, offered for sale, and publicly released;

g. whether transaction, submission, shipping, payment, collection, or other metadata accompanied the publicly reported identifiers;

h. whether Defendants provided timely and adequate notice and an accurate individualized accounting;

i. whether Defendants breached duties of ordinary care and contractual or quasi-contractual obligations;

j. whether Defendants' representations and omissions violated the New Mexico Unfair Practices Act;

k. whether Class members are entitled to damages, restitution, declaratory relief, or prospective security and data-minimization relief; and

l. the appropriate measure and administration of classwide relief.

130. Typicality. Plaintiff's claims are typical because they arise from the same Data Breach, security and retention practices, attempted sale and public dissemination, and failure to provide a complete accounting that affected the Classes. Plaintiff's exact email was verified in the corpus, and he directly paid Beckett and supplied the same categories of information compromised.

131. Adequacy. Plaintiff will fairly and adequately protect the interests of the Classes. He has no interest antagonistic to the Classes, has preserved contemporaneous transaction and support records, understands his responsibilities, and has retained counsel experienced in complex and data-breach litigation.

132. Predominance. Common questions predominate over individualized questions because liability turns principally on Defendants' uniform security, retention, vendor-management,

incident-response, notice, privacy, and contract practices and on common proof concerning the affected systems and corpus.

133. Individual damages questions, if any, do not defeat predominance. Classwide proof can establish actual dissemination, privacy loss, reasonable monitoring needs, benefit-of-the-bargain and restitutionary measures, and standardized benefit structures, while documented extraordinary losses can be addressed through claims administration or subclasses.

134. Superiority. A class action is superior because individual claims are generally too small to justify separate litigation against two business entities; the evidence is concentrated in Defendants' systems and vendors; separate actions would duplicate expert and forensic work; and coordinated adjudication avoids inconsistent results.

135. Rule 23(b)(2). Defendants have acted or refused to act on grounds applicable to the Classes by maintaining common security, retention, notice, and remediation practices. Declaratory and injunctive relief addressing those practices can be framed to apply classwide.

136. Manageability. The Classes can be identified using Defendants' customer, submission, account, support, transaction, and notification records together with the compromised corpus. State-law variation, if material, can be managed through subclasses, grouping materially similar laws, or issue certification rather than denying relief to all victims.

137. Ascertainability. Membership is based on objective facts: whether a person's information was included in the Beckett Data Breach and, for the subclasses, citizenship or a direct paid transaction. HIBP verification and Defendants' own records supply workable methods for confirming those facts.

**COUNT I**

**NEGLIGENCE**

**(On Behalf of Plaintiff and the Nationwide Class, or Applicable State Subclasses)**

138. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

139. Defendants owed Plaintiff and Class members a duty of ordinary care in collecting, storing, retaining, transmitting, accessing, securing, minimizing, disposing of, and responding to incidents involving their personal and transaction-linked information.

140. The duty arose from Defendants' affirmative collection and retention of information; Defendants' superior knowledge and control; customers' inability to inspect or protect Defendants' systems; the foreseeability of criminal theft and misuse; the direct commercial relationship; Defendants' privacy and security undertakings; and the public policy reflected in data-security statutes and regulatory guidance.

141. The duty exists independently of any promise concerning the quality or outcome of authentication or grading. Plaintiff does not seek in tort merely to recover the benefit of the authentication service; he seeks recovery for Defendants' separate failure to exercise reasonable care over information and the resulting privacy and misuse harms.

142. Defendants breached their duty through the security, retention, access-control, vendor-management, monitoring, data-minimization, incident-response, investigation, and notice failures alleged above.

143. Defendants' breaches actually and proximately caused or substantially contributed to the theft, exfiltration, attempted sale, public dissemination, phishing, mitigation burdens, and

other harms. The attacker's criminal conduct was foreseeable and within the scope of the risk Defendants had a duty to guard against.

144. Plaintiff and Class members suffered actual and legally cognizable injury, including loss of privacy and confidentiality; actual disclosure to unauthorized persons; loss of control; mitigation and monitoring time; unwanted communications; diminished account security; costs of protective measures; documented fraud and misuse where applicable; business interruption and consequential loss where applicable; and continuing protective burdens.

145. New Mexico law recognizes a duty of ordinary care concerning stored private data and permits a negligence claim based on time and resources reasonably spent responding to a breach. Plaintiff's allegations are at least as concrete because his precise email was verified in a publicly released corpus and he alleges increased phishing and economic consequences.

146. As a direct and proximate result, Plaintiff and the Class are entitled to compensatory, consequential, nominal, and other damages available under the governing law, together with appropriate equitable relief.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Paid-Customer Subclass)**

147. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

148. When Plaintiff and Paid-Customer Subclass members purchased Beckett services and supplied personal and transaction-linked information required to administer those services, the parties formed express and/or implied-in-fact agreements.

149. Plaintiff agreed to pay $150 and provide information necessary for Beckett to identify, process, communicate about, and document Submission No. 100235. Beckett agreed to perform the purchased service and, as an implied and material term, to use the information only for legitimate purposes and exercise reasonable care while retaining it.

150. The promise of reasonable protection is necessary to effectuate the transaction and reflects the parties' reasonable expectations. No reasonable customer would pay Beckett and provide home-address, telephone, email, submission, and payment-linked information if Beckett openly disclaimed any obligation to use reasonable safeguards.

151. Plaintiff performed by paying the charge, supplying the requested information, signing the form, presenting the item, and later providing the submission records Beckett requested through its support process.

152. Defendants accepted Plaintiff's payment and information, created and retained submission and support records, and obtained the commercial and operational benefits of the transaction.

153. Defendants breached the implied agreement by failing to use reasonable safeguards; retaining information without adequate controls; allowing it to be accessed, exfiltrated, offered for sale, and publicly released; and failing to provide a prompt and complete accounting enabling proportionate mitigation.

154. The adequacy of an implied-contract pleading depends on the specific exchange alleged. Unlike a complaint relying solely on the receipt of services from an unrelated data processor, Plaintiff alleges a direct paid transaction with Beckett, a form requiring the information for customer notification, and Beckett's repeated use of the same information in its own support systems.

155. Defendants' breach caused Plaintiff and Paid-Customer Subclass members the injuries described above. Plaintiff seeks contract, consequential, nominal, and other relief available under the governing law, without duplicative recovery.

156. If the Court determines that a written contract governs some aspects of the relationship, Plaintiff pleads this claim in the alternative to the extent reasonable data security and confidentiality are not displaced by a valid and enforceable express term.

**COUNT III**
**VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT**
**(N.M. Stat. Ann. §§ 57-12-1 et seq.; On Behalf of Plaintiff and the New Mexico Subclass)**

157. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

158. Defendants regularly engage in trade or commerce by selling grading, authentication, subscription, marketplace, publication, and related services to consumers, including New Mexico consumers, and by collecting and retaining the information required to provide and monetize those services.

159. Plaintiff directly purchased a Beckett authentication service for $150 and supplied the information Beckett required in connection with that sale. Defendants later retained, processed, and used his information while he was domiciled in New Mexico and continued to owe duties concerning that consumer transaction.

160. In connection with the sale and administration of their services, Defendants represented expressly and by necessary implication that they collected customer information for legitimate service, account, transaction, shipping, verification, and notification purposes and would employ commercially acceptable or otherwise reasonable means to protect it.

161. The "who" is Beckett Collectibles and Beckett Authentication Services acting through their forms, websites, privacy statements, customer-support systems, employees, and

vendors. The "what" is the representation and omission that customer data would be used for legitimate purposes and protected with reasonable safeguards, without disclosing unreasonable security, unnecessary retention, or an inability or unwillingness to provide a complete account after public dissemination.

162. The "when" includes Plaintiff's August 29, 2021 paid transaction; Defendants' December 2021 through February 2022 support interactions; the period during which Defendants retained the information; the November and December 2025 breach, sale, and public release; and the period in which Defendants failed to provide Plaintiff a complete individualized accounting.

163. The "where" includes the Beckett in-person transaction form, Beckett-branded web and email support channels, Defendants' customer and data systems, and communications or omissions directed to affected consumers, including Plaintiff in New Mexico.

164. The "how" is that Defendants obtained Plaintiff's money and data by presenting the collection and retention as a necessary and legitimate part of the service, while failing to disclose material facts about unreasonable security or retention and later failing to provide the information needed to protect the same accounts and contact channels associated with the compromised record.

165. Defendants knowingly made the representations and omissions because they knew what information they required, where and how long they retained it, what safeguards they used, what risks and warnings existed, what occurred during the intrusion, what the forensic investigation found, and what they did or did not disclose. "Knowingly" under the Act does not require proof at pleading that Defendants intended the breach or desired the resulting harm.

166. The representations and omissions were false or misleading, or had a tendency to deceive, because Defendants allegedly failed to use reasonable security and minimization while

obtaining and retaining the benefits of customers' payments and information and failed to provide a complete accounting after the data was offered for sale and released publicly.

167. The practices were material. A reasonable consumer would consider the security, retention, confidentiality, and post-breach treatment of home-address, telephone, email, username, submission, transaction, and related information in deciding whether to purchase, what information to provide, and whether to continue using Beckett services.

168. Defendants' conduct caused Plaintiff and New Mexico Subclass members actual damages, including the injuries and mitigation costs described above, and deprived them of the benefit of services represented as including reasonable handling of required customer information.

169. To the extent Defendants acted willfully after learning of material security or disclosure facts, Plaintiff seeks the enhanced relief authorized by the Act. Plaintiff and the New Mexico Subclass seek actual or statutory damages, treble damages where permitted, restitutionary relief, reasonable attorneys' fees and costs, and appropriate equitable relief under N.M. Stat. Ann. § 57-12-10.

**COUNT IV**
**RESTITUTION / UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Classes; Pleaded in the Alternative)**

170. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

171. Defendants received and retained valuable benefits from Plaintiff and Class members, including direct payments, personal and transaction-linked information, customer registrations, submissions, contactability, repeat engagement, marketplace participation, support histories, and the commercial value and cost savings associated with retaining those records.

172. A portion of the price and value exchanged was reasonably attributable to secure handling, administration, retention, and protection of the information Defendants required.

Reasonable security was a cost of doing business that Defendants were not entitled to avoid while shifting the resulting risks and expenses to customers.

173. Defendants also obtained the benefit of using customer information for operations, customer service, verification, analytics, marketing, account management, and other commercial purposes for as long as they retained it.

174. It would be inequitable for Defendants to retain the full benefit of payments, information, and avoided security or minimization expenditures after allegedly failing to provide the reasonable data handling inherent in the exchange and forcing victims to bear the costs of public disclosure and mitigation.

175. To the extent no enforceable contract supplies an adequate remedy, Plaintiff and the Classes seek restitution, disgorgement of wrongfully retained benefits, and other equitable monetary relief permitted by the governing law. This Count is pleaded in the alternative and does not seek duplicative recovery.

**COUNT V**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiff and the Classes)**

176. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

177. An actual controversy exists concerning whether Defendants' security, retention, vendor-management, notice, and remediation practices satisfy their legal obligations and whether Defendants may continue retaining and using affected customer information without implementing reasonable safeguards and minimization.

178. The controversy is ongoing. Defendants continue to operate customer systems and, on information and belief, continue to retain information belonging to Plaintiff and Class members; the full affected fields and systems have not been disclosed to Plaintiff; the public corpus remains

available for misuse; and Defendants have not established that all compromised pathways and stale records have been remediated.

179. Money damages alone cannot provide Plaintiff and Class members with the information necessary to protect affected accounts, reduce unnecessary retention, verify deletion, or require prospective safeguards against another compromise of information Defendants continue to hold.

180. Plaintiff and the Classes seek a declaration of the parties' rights and appropriate injunctive relief requiring Defendants, as warranted by the evidence and tailored by the Court, to:

a. identify and disclose the affected systems, intrusion and exfiltration period, categories of data, and individual fields reasonably attributable to each affected person;

b. provide complete, accurate, and appropriately updated notice to affected persons;

c. implement and maintain reasonable access controls, privileged-account protections, multifactor authentication, segmentation, monitoring, logging, vulnerability management, encryption, and exfiltration detection;

d. conduct and document an independent assessment of the affected environment and remediation;

e. review vendors and third-party access and implement reasonable contractual, technical, and audit controls;

f. inventory, minimize, securely delete, or de-identify customer information that no longer serves a legitimate and disclosed purpose;

g. provide appropriate identity-restoration, fraud-resolution, account-protection, or monitoring services proportionate to the data actually affected;

h. maintain and test an incident-response plan capable of prompt investigation and individualized notice; and

i. provide such reports, verification, and other relief as the Court deems necessary and proportionate.

181. The requested relief would reduce the risk of another compromise of information Defendants continue to hold, improve victims' ability to protect the exact identifiers and relationships involved, and prevent Defendants from retaining unnecessary customer data without reasonable controls.

182. Plaintiff seeks declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, Federal Rule of Civil Procedure 23(b)(2), the New Mexico Unfair Practices Act where applicable, and the Court's equitable authority.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the proposed Classes, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

A. Certifying the proposed Classes and appropriate subclasses under Rule 23; appointing Plaintiff as class representative; and appointing his counsel as class counsel;

B. Declaring that Defendants owed and breached the duties and obligations alleged in this Complaint;

C. Awarding actual, compensatory, consequential, nominal, statutory, restitutionary, and other damages available under the governing law;

D. Awarding treble or enhanced damages under the New Mexico Unfair Practices Act and punitive damages where the evidence and governing law permit;

E. Ordering restitution, disgorgement, and equitable monetary relief without duplicative recovery;

F. Entering appropriate injunctive relief concerning security, notice, individual data accounting, retention, deletion, vendor management, independent assessment, and protective services;

G. Awarding pre-judgment and post-judgment interest;

H. Awarding reasonable attorneys' fees, litigation expenses, and taxable costs as permitted by law; and

I. Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 5, 2026

Respectfully submitted,

EGOLF + FERLIC + MARTINEZ, LLC

/s/ Kristina Martinez
Kristina Martinez
123 W. San Francisco St., Second Floor
Santa Fe, New Mexico 87501
(505) 986-9641
Kmartinez@EgolfLaw.com

HALL ATTORNEYS, P.C.
/s/ Nicholas Andrew Hall
Nicholas Andrew Hall
Texas Bar No. 24069863
P.O. Box 1370
Edna, Texas 77957
Telephone: (713) 428-8967
Email: nhall@hallattorneys.com
*Admission or association under D.N.M.LR-Civ. 83.3 forthcoming*

John J. Nelson (CA SBN 317598)
MILBERG, PLLC
280 S. Beverly Drive, PH Suite
Beverly Hills, CA 90212
Tel.: (858) 209-6941
jnelson@milberg.com
*Admission or association under D.N.M.LR-Civ. 83.3 forthcoming*

*Attorneys for Plaintiff and the Proposed Classes*

**LOCAL COUNSEL CERTIFICATION UNDER D.N.M.LR-Civ. 83.3(a)(1)**

The undersigned member of the Federal Bar certifies that Nicholas Andrew Hall is a member in good standing of the State Bar of Texas, accepts service in this action, and will continue in the action unless another Federal Bar member is substituted, as required by D.N.M.LR-Civ. 83.3(a)(1).

/s/ Kristina Martinez
Kristina Martinez